The plaintiff, having obtained the necessary legislative authority by virtue of Act 354 of 1940, instituted this suit against the State of Louisiana seeking to recover damages for personal injuries and other damages incidental thereto, in the total *West Page 91 
sum of $57,012. The claim arises out of an accident which occurred at about 12 o'clock midnight on December 3, 1938, on a bridge some few hundred yards west of the Town of Abita Springs in the Parish of St. Tammany. His suit against the State is predicated on the negligence of the then Louisiana Highway Commission which was charged by law with the maintenance, repair and inspection of State highways and bridges, in its failure to have maintained in proper state of repair and condition the bridge on which the accident took place.
In his petition plaintiff alleges that the highway running east and west between the towns of Covington and Abita Springs, being part of Highway No. 58 of the State of Louisiana, is a much travelled road to the knowledge of the Highway Commission whose officials and employees should have known their duty to maintain the same in a safe and passable condition and not permitting the bridge to become a "death trap" as it is referred to by him.
He avers that on December 3, 1938, he was driving a new Chevrolet truck owned by his employer, Modern Gas Company, Inc., going from Covington in an easterly direction towards Abita Springs and that the said truck was equipped with proper lighting facilities for the purpose of driving at night and that he was occupying the proper side of the highway, going at a reasonable and lawful rate of speed. He avers further that at about a quarter of a mile from the center of the Town of Abita Springs, there were two bridges, the first or most western being a wooden bridge which at the time had a guard rail on the left or north side but none on the right or south, and the other was a concrete bridge over the Abita River with a concrete rail or guard on each side, and that a distance of about 170 feet separated the two bridges.
He then alleges that the first or most western bridge was, at the time of the accident, in a very bad condition and was wholly unsafe. Specifically, he avers that one of the stringers or supporting timbers on the southern side had broken loose completely more than sixty days before the accident. There was a sagging and twisting of the surface contour of the bridge, causing the planking to be loosened and a deep depression to be created on the southern side which was the direction in which he had his car. That the sagging caused the southwestern half of the bridge or that side from which he was approaching it, to kick up above the surface of the highway and that a loose gravel fill was placed as a sort of approach which rose some inches higher than the edge of the bridge and some 15 to 17 inches higher than the surface of the highway. He alleges further that the condition as described was not visible to motorists approaching the bridge who were not familiar with its condition, all of which the State of Louisiana, through the Louisiana Highway Commission, its officers, agents and employees, had knowledge of.
He alleges that he was unfamiliar with the dangerous condition there existing and that there were no lights, warning signs or signals of any kind to give him notice and that the failure to place such lights, signs or warnings, constituted the grossest type of negligence, on the part of the Highway Commission, its officers, agents and employees.
He then describes the manner in which the accident took place, averring that as he struck the dangerous fill at the western approach to the bridge, his truck was thrown into the air, bounding heavily on to the sagging portion and causing him to strike the top or other interior part of the truck with his head, and rendering him immediately unconscious, thus losing control of his truck which afterwards ran along the highway until it struck the northwestern corner guard of the concrete bridge further east before coming to a stop.
Plaintiff then alleges that for several months prior to the occurrence of his accident, numerous officials, citizens and motorists had repeatedly notified the Louisiana Highway Commission through its agents, officers and representatives that the said bridge should be fixed and properly repaired; that the Governor of the State was communicated with and that delegations called on the Chairman of the Louisiana Highway Commission to have the situation remedied, all of which requests were ignored until after the accident happened. He alleges that the sole, only and proximate cause of the accident was the unexpected defects in the highway and bridge with which he was not familiar and the lack of any signs to give warning of the same. *West Page 92 
He then sets out in detail the nature and extent of his injuries which are of the most severe and serious character and for which he is entitled to recover the damages he seeks. These damages he itemizes as follows: Loss of wages from the date of the accident to the date on which suit was filed, 92 weeks at $18.50, making the sum of $1,702; future loss of wages and earnings, $25,000; pain and suffering, $15,000; permanent injury, $15,000; drugs and accessories, $40; medical expenses, $270.
The answer of the defendants constitutes practically a general denial but after the case had been assigned for trial on one or two occasions, and it had been agreed that the testimony of the plaintiff and certain witnesses residing in the City of New Orleans would be taken out of Court by consent, the defendant filed a supplemental answer in which it reiterated its denials as made in the original answer and in the alternative pled that in the event the court should find that there was any negligence on the part of the Louisiana Highway Commission making it legally liable in damages to the plaintiff, that the plaintiff himself was barred from recovery for such damages due to the fact that he himself was negligent and that his negligence was the proximate cause of his injury. The negligence charged against him consisted in (a) driving at an unlawful and illegal rate of speed contrary to the laws of the State of Louisiana and more particularly to the provisions of Act 286 of 1938, and also contrary to the laws and ordinances of the Town of Abita Springs and more particularly Ordinance No. 45 of the said town for the year 1916; (b) driving in a reckless and illegal manner without using due care to keep his automobile under proper control and in not keeping a proper lookout for any obstructions which may have been in the road and (c) having knowledge of the defective condition which he alleges existed in the highway or bridge, whether the same was caused through the negligence of the Highway Commission or not and failing, in the face of such knowledge, to use due care to protect himself from injuries which may result therefrom.
Although there was no motion filed by the plaintiff to strike out the supplemental answer of the defendant, objections were made thereto when the case was taken up for trial in open court and its filing seems now to be a controverted issue in the case, it being strenuously urged that issue having already been joined by the former pleadings and the case having been assigned for trial, it was filed too late.
The test to be applied in permitting or refusing a plaintiff to file amended pleadings, after issue has been joined, is laid down in Article 419 of the Code of Practice which gives the Court discretion in permitting him to do so "provided the amendment does not alter the substance of his demand by making it different from the one originally brought." By the terms of Article 420 the defendant is also granted the right to amend his answer, "subject to the same rules." The amendment to the answer filed by the defendant in this case was an alternative plea which in our opinion did not have the effect of altering the substance of the defense as presented in the original answer. That defense was a denial of the negligence charged against it and of its consequent liability in damages on account of such negligence as had been alleged. The plea of contributory negligence, made in the alternative, was not inconsistent with that defense; it merely raised the further issue that even if the negligence alleged against it would be shown to exist that it could none the less be possible for the plaintiff to recover because he himself had been negligent in such manner as contributed to the accident and resulting injuries. The sole and only question which could arise under this plea would have to relate to the negligence charged by the plaintiff which is denied by the defendant, which shows after all that the issue involved is one of negligence purely and on that issue is the case to be decided. There are some cases, notably a recent one decided by this Court, Moore v. Davis, 196 So. 566, in which the defendant was refused permission to file a supplemental answer setting out a plea of contributory negligence, but in that case, the testimony of the plaintiff and the defendant had already been taken and to permit the filing of the supplemental answer at that time might have necessitated the taking of additional testimony including that of the plaintiff, who had already returned to her home in Chicago and might have to come back to Opelousas to testify. It was held that the plea of contributory negligence being a special defense, plaintiff is entitled to know what it consists of prior to the trial of *West Page 93 
the case. Whilst it is true that in the present case an assignment for trial had been made, no testimony whatever had as yet been taken and plaintiff was made aware of what was contained in the plea before the case actually went to trial. Under the circumstances we do not think that there was an abuse on the part of the trial judge of his discretion in permitting the amended answer to be filed.
Having disposed of this matter we come now to a consideration of the issues that are presented on the pleadings as thus made up. These may be said to involve the responsibility with which the Louisiana Highway Commission was charged with the maintenance in safe and proper condition of the bridge at which this accident occurred, and the manner in which it discharged its duties; the negligence as alleged on the part of the said Commission, assuming that the bridge was not maintained in proper condition of repair, to have proper warning signs to vehicular traffic approaching it; the duty of an automobile driver on the highways in observing the proper speed limit, in keeping his car under proper control and maintaining a proper lookout for obstructions or other dangers on the highway, and his duty to do so especially in a situation where he is charged with having knowledge of the existence of such obstructions or dangerous condition. On these issues the trial judge, after a lengthy hearing, handed down an opinion for the record in which he resolved the issue of negligence against the Highway Commission, the plea of contributory negligence in favor of the plaintiff and awarded the latter damages in the sum of $17,926, with legal interest from date of judicial demand. From a judgment so decreeing, the defendant Highway Commission has taken and is now prosecuting this appeal. Plaintiff has answered the appeal asking that the judgment be amended by increasing the award to the sum originally demanded by him.
In the month of August, 1938 there was a flood in the neighborhood of this bridge and the south walls supporting the culvert were washed out. It became necessary for the Highway Commission to construct a temporary wooden bridge over the damaged culvert and this it did by laying timbers measuring 4 inches by 12 inches, 12 inches apart, lengthwise over the crossing and then laying 3 x 12 planks across the timbers, the whole making an elevation from the flooring of the bridge of 7 inches. In order to connect the structure as thus made with the road on each side of it, there was a fill made with gravel and clay some 3 or 4 feet long and the evidence fully shows that these fills were higher than the bridge to the extent of some 9 inches or more. There is considerable testimony to the effect that in the course of time the wooden structure settled and that the bridge sagged in the middle especially in the south portion. This is clearly apparent from a photograph taken of the bridge and which has been filed in the record. The sagging condition is disputed by some of the witnesses who testified for the defendant but the vast preponderance of the testimony shows that that was the condition and that there was a drop of some 2 or 3 inches.
Having in mind the situation which existed, the question then arises, Did the Louisiana Highway Commission discharge the duty imposed upon it by law to maintain and repair that bridge and keep it in proper condition at all times? That duty is clearly imposed upon it under sections 17 and 28 of Act 95 of 1921, Ex.Sess., as amended. Counsel for the defendant do not presently dispute that such an obligation or duty exists but they strenuously contend that as long as it is discharged and performed in a reasonable manner, the law has been satisfied, and that so far as its obligations existed with regard to the bridge involved in this case, it had reasonably performed its duty and that the bridge was in a reasonably safe order of repair and condition for traffic using it.
We regret to have to state that we cannot agree with counsel that the Commission had discharged its full duty in the way of repairing and maintaining this bridge in a reasonably safe condition, as is shown by an abundance of testimony found in the record. The very fact that the accident in this case which caused the death of one person and the severe injuries sustained by another, affords some proof at least that the condition wasn't safe to permit travel over the bridge by an automobile truck at a rate of speed of approximately 40 miles per hour, assuming as the testimony tends to show, that the plaintiff had slowed down the speed of his truck from 45 miles after he first observed the contour of the bridge a short distance before striking it. A bridge on *West Page 94 
a highway travelled as much as this one seems to have been, which cannot stand traffic going at as much as 40 miles per hour, cannot in our opinion be said to have been in a reasonably safe condition for traffic which had to cross it.
But quite a number of substantial citizens of the community, including some public officials of the town and parish, testified in this case regarding the condition of the bridge, and reading their testimony as a whole, the court cannot be left with any serious doubt that it was in a really bad condition, one that required the attention which they seemed to have frequently requested of the Louisiana Highway Commission in vain until after this unfortunate accident had happened.
It is shown that numerous complaints were made and that delegations, headed by the State Representative of the Parish of St. Tammany, called on the Chairman of the Highway Commission himself, directing his attention to the situation but nothing was done. It is urged on behalf of the defendant that these conferences had to do with the situation concerning the whole highway and the requests were for general improvements and whilst the testimony of some of the witnesses does indicate that such demands or requests were made, nevertheless the primary purpose of these interviews and all other complaints were to have the condition existing at this bridge remedied.
There is testimony that an accident had happened previous to the one in which plaintiff was involved and several of the witnesses to whom we have referred who crossed this bridge either daily or several times a week testified as to the careful manner in which they had to approach it in driving their automobile, some of them referring to the fact that invariably they had to almost stop and shift gears before they attempted to go upon it.
Not only does the testimony convince us, as it did the district judge, of the failure of the Louisiana Highway Commission in its duty in properly repairing and maintaining the bridge in safe and proper condition but it further satisfies us that it did nothing to warn traffic on the highway of the situation of danger that existed. Practically all the same witnesses who testified regarding the actual condition of the bridge stated that there were no signs of warning of any kind to give notice of that danger. In this connection the defendant offered the testimony of some of the members of the bridge crew engaged in that district, to the effect that there was a danger sign posted some 400 feet or more west of the bridge on the south or right side of the highway. This sign is described as having been of a diamond shape with large red letters spelling the word "Danger". We are not strongly impressed with the testimony of the witnesses that the sign which they referred to was actually posted where they said it was at the time of the accident. The one who seemed to insist that it was, finally qualifies his statement by stating that "it must have been." But the important point in relation to this sign is that it seems to have had no connection whatsoever with the dangerous situation which existed surrounding the bridge and the approach to it. The testimony shows rather positively that the purpose of this sign was to warn traffic on the highway of its approach to an intersecting road known as the Range Line Road which led to a summer hotel situated off of the highway. Situated as it was some 400 feet or more from the bridge and around a curve leading from the bridge, it could serve no purpose whatsoever in warning the travelling public that there was a bridge around that curve and that it was in such condition as existed at the time of this accident. In its failure to have properly guarded or protected the public in approaching the danger created by this bridge on the highway, the Commission was again negligent and therefore it was properly held liable to the plaintiff in damages unless the district judge was in error in overruling its plea of contributory negligence.
On this plea as we have seen, plaintiff is charged with negligence in three respects: (a) Driving his car at an excessive rate of speed in violation both of the State Highway Regulatory Statute and of the Ordinance of the Town of Abita Springs, (b) in not having his car under control and keeping a proper lookout and (c) in not properly guarding against the situation of danger or defects in the road of which he had knowledge.
The evidence discloses that plaintiff was driving a Chevrolet truck loaded with some 1500 lbs. of piping, pipe fittings and tools. He had a business call which took him to Picayune, Mississippi, and on the afternoon before the accident happened he decided to drive to Covington to visit *West Page 95 
with his father and mother and go from there to Picayune. He was accompanied by a lady by the name of Ann Walker. He left Covington at approximately 11:45 that night and drove along Highway No. 58 going at a speed approximately 45 miles per hour, according to his testimony. The lights on his truck were in good condition and apparently he had the normal vision of an automobile driver which is projected by such headlights. He is not positive how far away he was from the bridge when he saw its outline but was unable to discern what its condition was. He released his foot from the accelerater on the truck which had the effect of slowing its speed down to about 35 miles an hour. That is the last thing he remembers as he apparently struck the bridge immediately thereafter and was knocked unconscious. He remembers absolutely nothing that happened afterwards until he found himself in the Charity Hospital in New Orleans. The lady in the car with him was killed instantly.
A witness by the name of Arthur Martin, a barber who lived on the highway west of the bridge and who was walking home, testified that he met the truck when about 150 to 200 feet from the bridge on the Covington side. He says that it was going about 40 or 45 miles at the time and knowing the condition that existed at the bridge, and no doubt out of a sense of apprehension for what might happen, he turned around and as he did so it appeared to him that the truck slowed down its speed. It nevertheless hit the bridge and went up in the air. He ran to the scene and when he reached there he found a man lifting the lady from the cab of the truck and another assisting Matlock who was jammed in a stooping position between the seat and the running board, in an unconscious condition. The truck came to a stop against the rail on the left-hand side of the concrete bridge further east towards Abita Springs. The distance between the eastern end of the wooden bridge and the concrete bridge is shown to have been 226 feet.
Under the facts as thus presented the question that arises is whether the speed at which plaintiff was driving the truck was excessive and in violation of either the state statute or the Ordinance of the Town of Abita Springs, and thus a contributing cause to the accident.
The defendant in support of its plea that the speed constituted a violation of the Town Ordinance of Abita Springs, annexed thereto a copy of an ordinance fixing the rate at 12 miles per hour. According to the title of this ordinance it is one "regulating the operation and speed of automobiles for the year 1916." In the body of the ordinance itself we find nothing which indicates that it expired by limitation at the end of that year. Why the year was specified in the title is not explained and we are unable to understand what is meant by it. Be that as it may, it appears to be an ordinance fixing the maximum rate of speed upon the public highways within the corporate limits of the town at 12 miles per hour and provides further that at all street and alley crossings, the speed should be reduced to 7 miles. It is not disputed that that portion of the highway at which the bridge on which the accident occurred is within the corporate limits of the Town of Abita Springs. The testimony of the officials and those charged with the enforcement of the ordinance is to the effect that although it has never been specifically repealed, its provisions were not being enforced in the year 1938 at the time this accident occurred. In view of our modern system of highways and the large increase in automotive traffic since the year 1916, we doubt very much that any town or municipality of the size of Abita Springs attempts to enforce a speed regulation of anything like 12 miles per hour. Moreover, at the point on the highway where this bridge was situated the driver on the highway was still in open country and there wasn't a sign of any kind to indicate to him that he was within the corporate limits of the Town of Abita Springs and that his speed was controlled by any local ordinance. Conceding that the ordinance was still in effect, we do not think that any Court would be justified in convicting any one or holding any one liable for negligence for its violation when it is so clearly apparent that its provisions were not enforced by the officers of the municipality charged with its execution.
Counsel for defendant urge that if the speed limit as fixed under the ordinance did not apply that plaintiff nevertheless was guilty of violation of the provisions of subsection (c), rule 4 of section 3 of the state statute, Act 286 of *West Page 96 
1938, which fixes a speed limit of 25 miles per hour upon certain parts of the highways of the State. It appears however that this regulation applies on those highways within or through any town or village of the State which is not incorporated and as Abita Springs is and was an incorporated town at the time of the accident, that provision does not apply. It would seem therefore that the only restriction on the plaintiff's driving at the time is that found in paragraph (a) of rule 4 of the same section of the statute which prescribes that no one shall drive or operate a motorcar or other vehicle on the highways of the State "at other than a careful, prudent, reasonable and proper speed, having due regard to the traffic, surface and width of the highway, the location and neighborhood, and any other conditions or circumstances then existing, and no person shall, under any circumstances or conditions, drive any vehicle upon the public roads, highways or bridges of this State, at such a speed as will endanger the life, limb or property of any other person."
We have already given a description of the surrounding territory having omitted only to mention the width and the surface of the highway which was shown to be a standard 18 foot road with a hard black top surface, and whilst not new, was nevertheless in good condition. Travelling as he was, near midnight, with no traffic on the highway at that time, and with his lights in good condition, it can hardly be said that plaintiff's speed of 40 or 45 miles per hour was excessive. Whilst there was a curve in the road some distance from the bridge it is not indicated in the testimony that it was a sharp or dangerous curve in any manner and he seems to have experienced no difficulty in negotiating it prior to his approach to the bridge. In the case of Lavergne v. Pedarre, 165 So. 17, this Court held that a speed of some 40 to 45 miles an hour on Highland Road, the principal thoroughfare leading from the City of Baton Rouge to Louisiana State University, at about 10 o'clock at night, and on which traffic was governed under the same provisions of the statute as we find to apply in this case, was not excessive and the driver of an automobile whose car collided with another coming out of an intersecting street was not liable to the guest passengers in his car on the ground that he was negligent. Neither in this case do we think that plaintiff was guilty of negligence since he was operating his truck two hours later in the night on a highway which by comparison is not near as important. It is urged that the distance the truck travelled after striking the defective bridge before coming to a rest is an indication of the excessive speed at which it must have been going. It must be remembered however that plaintiff was rendered unconscious the moment he struck the bridge, that he lost control and necessarily made no effort to try to stop the truck as it went headlong on its own course until it struck the guard rail on the concrete bridge. That, in our opinion, is a sufficient explanation why the car was not stopped, or did not stop by itself before, and it affords no proof whatever of a greater rate of speed than that at which plaintiff admits he was going at the time that he struck the bridge.
The next charge of negligence aimed at the plaintiff is his failure to keep his car under proper control and to have maintained a proper lookout for dangers or obstructions on the highway. In this respect, there is less proof of negligence on his part than in the charge of violating the speed regulations which we have just discussed. Plaintiff testifies that he was keeping a proper lookout ahead, that the lights on his car were working as they should and that immediately upon seeing the single rail of the bridge, he reduced its speed to what he estimates was about 35 miles an hour. As has already been stated there was absolutely no sign on the highway of any kind to give him a warning of this dangerous situation and there were no intersecting roads or streets close enough of any consequence to cause him to do any more than he did. The danger sign posted some 400 feet or more away, as we have already indicated, was not a sign intended to give warning of the defective condition in the bridge and from the manner in which he approached that sign, considering its location, it is doubtful whether the beams from his headlights brought it to his attention at all. The weather was clear and otherwise there were no circumstances which required him to exercise greater care in having his car under control and to keep a better lookout ahead than he did.
The last point raised in the plea of contributory negligence is the one on which *West Page 97 
plaintiff is charged with failure to have taken proper steps to guard himself in face of his knowledge of the defective condition of the bridge but the only proof of any knowledge on his part is his own testimony that he was unfamiliar with the road, having travelled over it very infrequently and the last time, as he remembers, being more than a year before the accident happened, which of course was before the washout had taken place and the bridge had become defective and in the condition it was on the night he was injured.
A careful consideration of all the testimony leads us to the same conclusion as that reached by the district judge that the defendant has not supported its plea of contributory negligence against the plaintiff by competent and satisfactory proof and he is therefore entitled to recover damages.
It would serve no useful purpose for us to go into a detailed discussion of the gravity and severity of the many injuries sustained by the plaintiff as a result of this accident. Suffice it to say that he has been confined to the Charity Hospital in a plaster cast almost continuously since it happened. He has undergone any number of operations for the removal of pieces of bone in his hip which have become infected due to the formation of pus in the joint. He almost lives with drains in his side to take care of the pus formation in his body. The probabilities are that he will never recover sufficiently to be well again and that if he should he will never have the use of one of his legs. That his suffering must have been agonizing at the time of the accident and afterwards is well brought out in the statement of Dr. L.C. Heintz to whom he was taken on the night of the accident and who took him to the hospital and kept in touch with him afterwards, when he says that "he suffers as much as or more than anyone he has ever seen during his entire practice," which covers a period of 34 years. Plaintiff himself states that he never ceases suffering. He was at the time of the accident about 26 years old and was earning wages of $18 per week. He was married and had a child but he and his wife were separated and apparently he was not taking care of the child. The district judge awarded him the amount of wages he earned per week for the loss of time up to the date of the demand by his petition and which amount is $1,656 and $10,000 for the loss of future wages and earnings and for his permanent injury. We are inclined to believe due to the fact that he is not supporting his wife and child and has no other dependents, that the award of $10,000 may be a bit too liberal and have decided to reduce it to the sum of $8,000. For pain and suffering the district judge awarded him the sum of $6,000 which we also believe should be reduced to the sum of $5,000. The remaining award of $270 was for the services of Dr. L.C. Heintz which is supported by Dr. Heintz' testimony. The reductions we have made amount to $3,000 and the judgment will be amended in conformity therewith.
It is for the reasons herein stated now ordered, adjudged and decreed that the judgment appealed from be and the same is hereby amended by reducing the amount of the award from the sum of $17,926 to the sum of $14,926, and that as thus amended it be affirmed.